IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

```
SHARANKISHOR DESAI, individually,  )
etc.,                              )
                                   )
                Plaintiff,         )
                                   )
     v.                            )     No.  09 C 487
                                   )
GENERAL GROWTH PROPERTIES, INC.,   )
et al.,                            )
                Defendants.        )
```

<u>MEMORANDUM OPINION AND ORDER</u>

Sharankishor Desai ("Desai"), acting on behalf of himself
and other similarly situated individuals (collectively
"Plaintiffs"), has filed a three-count Amended Class Action
Complaint ("Complaint") that charges eleven individual
defendants[1] with securities fraud.  During the Class Period
(April 30 through October 24, 2008) Plaintiffs were common
stockholders of General Growth Properties, Inc. ("General
Growth"), a publicly traded real estate investment company.  All
defendants were officers or directors of General Growth.

---

[1]   Those defendants (referred to as "Defendants" when that
collective usage is appropriate) are John Bucksbaum
("Bucksbaum"), Bernard Freibaum ("Freibaum"), Robert A. Michaels
("Michaels"), Joel Bayer ("Bayer"), Edmund J. Hoyt ("Hoyt"), Jean
Schlemmer ("Schlemmer"), Sharon Polonia ("Polonia"), Ronald L.
Gern ("Gern"), Anthony Downs ("Downs"), Beth Stewart ("Stewart")
and Alexander Berman ("Berman").  All but Freibaum are
represented by the same team of attorneys (he has separate
counsel).  Although Freibaum's counsel have filed a separate
motion to dismiss and reply brief, those documents simply adopt
in their entirety, and incorporate by reference, the other
Defendants' motion and briefs.  Hence the Defendants' separate
filings will be treated as if they were single documents.

Plaintiffs now face Defendants' motions to dismiss for failure to state a claim under Fed. R. Civ. P. ("Rule") 12(b)(6) and for failure to plead securities fraud with particularity under Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA," 15 U.S.C. §78u-4(b))[2]. For the reasons described here, Defendants' motion is granted in part and denied in part.

<u>Background</u>

Because the allegations in the Complaint are by their nature highly fact-specific, and because analyzing Defendants' motion to dismiss requires detailed scrutiny of those factual allegations, this opinion can best recount most of the relevant facts while addressing particular disputes. At this juncture it is enough to explain the case's basic factual underpinnings.

Simply put, Plaintiffs allege that General Growth carried a debt load of over $27 billion at the beginning of the Class Period, with over $1.5 billion of that debt coming due by November 2008--at a time when the nation was in the midst of a profound credit crisis. Plaintiffs assert that General Growth's ability to refinance that debt was a matter of corporate survival, and if the marketplace had learned it would be unable to do so, General Growth's stock price would have tumbled,

---

[2] All further citations to Title 15 provisions will take the form "Section--," omitting "15 U.S.C." References to PSLRA provisions will also omit "§78u-," so that (for example) the provision just cited in the text becomes simply "Section 4(b)."

forcing it into bankruptcy. As it turned out, that is exactly what happened: General Growth did fail to refinance its debt, its stock price fell precipitously and it filed for bankruptcy in April 2009.

Plaintiffs allege that Defendants[3] artificially inflated the stock price during the Class Period by various means. For example, Plaintiffs say that Defendants failed to disclose that General Growth would not be able to refinance its maturing debt and, indeed, materially misrepresented General Growth's ability to do so. Notwithstanding those misrepresentations, Plaintiffs allege that General Growth's stock price began to slide, so much so that Defendants began to be hit with margin calls that forced them to liquidate significant portions of their own individual holdings in General Growth. At the same time, Defendants are alleged to have continued misrepresenting the company's ability to refinance its debt.

Plaintiffs further allege that former General Growth CEO and Board Chairman Bucksbaum, without the knowledge of its general investors, personally loaned at least $100 million to Chief Financial Officer Freibaum and Chief Operations Officer Michaels

---

[3] As n.1 suggests, the Complaint tends to collectivize "Defendants" even though their potential liability must of course be individualized. This Court deals expressly with the concept of "group pleading" later, at an appropriate place in this opinion, but in the meantime it should be understood that Defendants will indeed be scrutinized in individual terms.

3

to help them avoid or forestall forced liquidation of their stock on margin calls.  Those loans purportedly violated General Growth's ethics policy, and Plaintiffs assert that the failure to disclose those loans to the marketplace artificially elevated the price of General Growth stock.

Plaintiffs also allege that Defendants petitioned the SEC to include General Growth on a list of companies protected from "short-selling."  Defendants then assertedly engaged in insider trading at artificially inflated prices immediately after implementation of the short-selling ban.

Count I of the Complaint is based on Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act," Sections 78a et seq.) and the SEC's Rule 10b-5(b) (17 C.F.R. §240.10b-5).  In essence Count I charges that Defendants made misleading statements about General Growth's ability to refinance its future debt obligations and that if Plaintiffs had known the truth, they would not have purchased their shares at the inflated prices they paid or would not have purchased them at all.

Count II is also based on Exchange Act Section 10(b), but it is further based on SEC-promulgated Rules 10b-5(a) and (c).  That count concerns Defendants' alleged scheme to sell shares of stock at inflated prices.  Just what acts are alleged in Complaint Count II is disputed by the parties and will be addressed later.

Count III alleges violations of Exchange Act Section 20(a).

That count charges Defendants with "control person" liability for their alleged control of various reports, statements and public filings that General Growth disseminated to the marketplace during the Class Period.

## Applicable Standards

When deciding a motion to dismiss under the PSLRA, "the court must treat the pleaded facts as true and 'draw all reasonable inferences in favor of the plaintiff'" (Makor Issues & Rights, Ltd. v. Tellabs Inc., 513 F.3d 702, 705 (7th Cir. 2008) ("Tellabs III")).[4]  When a plaintiff alleges that a defendant "made an untrue statement of material fact," "the complaint shall specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading" (Section 4(b)(1)).  It must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" (i.e., "scienter")(Section 4(b)(2)). Complaints that fail to meet those pleading requirements are subject to dismissal (Section 4(b)(3)(A)).

## Count I

Plaintiffs have alleged in Count I that each individual Defendant made various untrue and actionable statements of

---

[4]  "Tellabs I" refers to the same case the first time it came before our Court of Appeals, 437 F.3d 588 (7th Cir. 2006). That opinion was then reversed and remanded by the Supreme Court in "Tellabs II," 551 U.S. 308 (2007), and the Tellabs III opinion cited in the text was issued after the remand.

material fact.  Defendants counter that many of those statements

are not actionable because they are protected under the PSLRA's

safe harbor provisions (1) for forward-looking statements and

(2) for present-tense assumptions underlying such forward-looking

statements.

Safe Harbor Under the PSLRA

There are "two independent prongs" to the PSLRA's Section

5(c)(1) safe harbor provision--subsections (A) and (B)[5]

(Southland Sec. Corp. v. Inspire Ins. Solutions, Inc., 365 F.3d

353, 371 (5th Cir. 2004)).  Those two prongs are separated by the

disjunctive "or," so that a person is not liable with respect to

a forward-looking statement if (emphasis added):

(A)  the forward-looking statement is--

(i)  identified as a forward-looking statement, and is
accompanied by meaningful cautionary statements
identifying important factors that could cause
actual results to differ materially from those in
the forward-looking statement; or

(ii) immaterial; or

(B)  the plaintiff fails to prove that the forward-looking
statement--

(i)  if made by a natural person, was made with actual
knowledge by that person that the statement was
false or misleading; or

(ii) if made by a business entity, was--

(I)  made by or with the approval of an executive

_____

[5]  Further references to those subsections will simply take
the form "Subsection --."

6

<div style="padding-left: 4em;">

officer of that entity; and

(II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.

</div>

Before turning to whether particular statements are protected, this opinion must first address some threshold issues raised by the parties.  For example, Plaintiffs argue that the safe harbor provision of Subsection (A) does not protect forward-looking statements that are accompanied by meaningful cautionary language if the forward-looking statements were known by the person making those statements to be false at the time they were made.  Defendants urge the opposite, pointing principally (though not exclusively) to this statement in Harris v. Ivax Corp., 182 F.3d 799, 803 (11th Cir. 1999):

> [I]f a statement is accompanied by "meaningful cautionary language," the defendants' state of mind is irrelevant.

That position has also been espoused by numerous district court decisions here and elsewhere, stating for example that for purposes of Subsection (A) "proof of knowledge of the falsity of a forward-looking statement is 'irrelevant' when the statement is accompanied by meaningful cautionary language" (In re Midway Games, Inc. Sec. Litig., 332 F. Supp. 2d 1152, 1168 (N.D. Ill. 2004) (citing cases, including the above-quoted language from Harris); see also Miller v. Champion Enters. Inc., 346 F.3d 660, 672 (6th Cir. 2003)).

That notion seems strongly counterintuitive.  On close analysis, it is not at all directly supported by this piece of legislative history relied on by <u>Harris</u> in reaching its conclusion (H.R. Conf. Rep. 104-369, at 44 (1995), reprinted in 1995 U.S.C.C.A.N. 730, 743 (emphasis added)):

> The first prong of the safe harbor requires courts to examine only the cautionary statement accompanying the forward-looking statement.  Courts should not examine the state of mind of the person making <u>the statement</u>.

What is missed by the conclusion stated in <u>Harris</u>, and in the like conclusions by other courts, is that the just-underlined words in the Conference Report make it clear that the mindset referred to there is that of the person making the <u>cautionary statement</u>, and not that of the author of the forward-looking statement that is charged as a deliberate falsehood.[6]

That being so, are we really to believe that Congress, in the course of tightening the standards of pleading and proof in private lawsuits claiming securities violations, intended to immunize deliberate liars from liability to those who invested in securities on the strength of such lies and suffered major losses?  That would appear to subvert the long-established

---

[6]  Note that the two statements--the forward-looking one and the cautionary one--need not have been made by the same person. And the plain reading of the two sentences quoted from the Conference Report is that the "statement" referred to in the second sentence is plainly the "cautionary statement"--that is the obvious thrust of the use of the word "only" in the first sentence.

principles of fraud-based liability.

Yet this Court also finds itself compelled to answer "Yes" to what should have seemed a rhetorical question calling for a "No" response. Although analysis shows the language that has been quoted from the Conference Report is really beside the mark in that regard, the unambiguous language of Section 5(c)(1)(A)(i) itself dictates that outcome--it requires only a forward-looking statement (whether true or false) plus an accompanying meaningful cautionary statement. In an effort to escape that result, Plaintiffs cite this dictum in No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp., 320 F.3d 920, 937 n.15 (9th Cir. 2003):

> [I]t is arguable that a strong inference of actual knowledge has been raised, thus, excepting these statements from the safe harbor rule altogether.

But that just seems to be the product of incredulity at such a result, rather than a reasoned conclusion, and this Court cannot in good conscience follow the Ninth Circuit's lead.

In sum, under the literal language of the safe harbor statute the author of any forward-looking statement--even though a deliberate falsehood--is insulated from liability so long as that statement is accompanied by some meaningful cautionary statement. Hence the proper inquiry is limited to (1) whether allegedly misleading statements were indeed forward-looking and (2) whether they were accompanied by meaningful cautionary

statements.  And because the charged statements must be looked at one by one to see whether they can properly be characterized as forward-looking, while cautionary statements can provide across-the-board insulation from liability, it is logical to turn to the latter issue first.

1.  <u>Meaningful Cautionary Statements</u>

Plaintiffs argue that the PSLRA's safe harbor protections cannot apply in this case because the statements that Defendants identify as cautionary were not "meaningful."  Plaintiffs' primary objections are that the cautionary statements (1) were "merely broad, redundant, boilerplate warnings," (2) failed to change over time to reflect specific problems that General Growth was experiencing in its attempts to obtain financing and (3) warned of adverse events that had already occurred.  With a single exception explained a bit later, none of those arguments prevails.

It will be remembered that safe harbor protection forecloses liability for forward-looking statements that are "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement" (Section 5(c)(1)(A)(i)).  To determine whether a statement was accompanied by meaningful cautionary language, courts consider cautionary statements that either accompanied the forward-looking statement or were

incorporated by reference (<u>Silverman v. Motorola, Inc.,</u> No. 07 C
4507, 2008 WL 4360648, at *12 (N.D. Ill. Sept. 23)).  And when
plaintiffs invoke a fraud-on-the-market theory, as here, they
"must acknowledge that <u>all</u> public information is reflected in the
[stock] price" (<u>Asher v. Baxter Int'l Inc.</u>, 377 F.3d 727, 732
(7th Cir. 2004)(emphasis in original)).  Thus cautionary
statements contained in SEC filings, so long as they were
available when the purportedly misleading statements cited by
Plaintiffs were made, were absorbed into the market and may be
considered by this Court in determining whether the oral
statements at issue were accompanied by meaningful cautionary
language (<u>id</u>.).

Cautionary language is meaningful "if it puts an investor on
notice of the danger of the investment to make an intelligent
decision about it according to her own preferences for risk and
reward" (<u>Stavros v. Exelon Corp.</u>, 266 F. Supp. 2d 833, 843 (N.D.
Ill. 2003) (internal quotation marks omitted)).  Cautionary
language must therefore be "substantive and tailored to the
specific predictions made in the allegedly misleading statement"
(<u>Johnson v. Tellabs, Inc.</u>, 262 F. Supp. 2d 937, 952-53 (N.D. Ill.
2003)).

But that language need not expressly refer to the risk that
ultimately caused the projection to differ from the results
(<u>Harris</u>, 182 F.3d at 807), for "prevision" on the part of

defendants is not required (<u>Asher</u>, 377 F.3d at 732).  Nor does
the PSLRA require the "<u>most</u> helpful caution" that is possible
(<u>id</u>. at 734 (emphasis in original)).  Identification of the
principal contingencies that could cause actual results to differ
from projections is sufficient (<u>id</u>.).  That said, however,
"'boilerplate' warnings won't do; cautions must be tailored to
the risks that accompany the particular projections" (<u>id</u>. at
732).

Defendants have identified numerous documents that they
maintain contained meaningful cautionary language that should
bring into play the safe harbor protections afforded by the
PSLRA.  And examination of those statements confirms that they do
contain such language.  Hence forward-looking statements made
after the issuance of those cautionary statements are sheltered
by the safe harbor--that is, so long as the cautionary statements
remain "meaningful" (more on this subject later).

General Growth's February 27, 2008 Form 10-K, which was
filed before the beginning of the Class Period and was available
throughout, contained specific and detailed discussions of the
risk factors associated with the company's ability to refinance
its maturing debt.  To begin with, its subsection entitled "Our
substantial indebtedness could adversely affect our financial
health and operating flexibility" acknowledged General Growth's
"substantial amount of indebtedness" and explained that one of

the potential consequences of that indebtedness was "[l]imiting our ability or increasing the costs to refinance indebtedness."

Furthermore, the Form 10-K subsection entitled "We may not be able to obtain capital to refinance debt or make investments, or obtain such capital on favorable or acceptable terms" stated (emphasis added):

> [W]e are primarily dependent on external financing to fund our business. Our access to debt or equity financing depends on investors' willingness to lend to or invest in us and on conditions in the capital markets in general. The willingness to lend to or invest in us is in turn effected [sic] by a number of factors, including our current level of indebtedness and limitations on our ability to service debt.
>
> In addition, we and other companies in the real estate industry have experienced less favorable terms for bank loans and capital markets financing from time to time. <u>Beginning in the third quarter of 2007, significant market deterioration which originated in the sub-prime residential mortgage market began extending to the broader real estate credit markets, which has resulted in a tightening of lender standards and terms and increased concerns of an overall market recession in 2008. Given our substantial amount of indebtedness and the significant deterioration in the credit markets, there can be no assurance that we will be able to refinance our debt or obtain additional financing on satisfactory terms.</u> In addition, our ability to refinance our debt on acceptable terms will likely be constrained further by any future increases in our aggregate amount of outstanding debt. However, we intend to fund future development costs at least in part through receipt of excess proceeds from refinancing activities, which will increase our outstanding debt. <u>Further, if market conditions or other factors lead our lenders to perceive an increased relative risk of our defaulting on a particular loan or loans, such lenders may seek to hedge against such risk which could negatively effect [sic] the price of our stock and decrease our ability to obtain certain types of financing</u>.

13

Similar statements warning that there was no assurance that General Growth could obtain refinancing on satisfactory terms were repeated elsewhere in the document.

Later the April 29, 2008 Press Release (one of the documents that Plaintiffs allege contained actionable misstatements) referred readers to that Form 10-K, where important risk factors had been identified that could cause results to differ materially from the forward-looking statements made in the release. Then during an April 30, 2008 Earnings Conference Call, General Growth's Director of Investor Relations Tim Goebel began the call by noting that it would include forward-looking statements and explained that "[a]ctual results may differ materially from the future operations suggested by these forward-looking statements due to various risks and uncertainties." While that statement may not have been as specific as the Form 10-K, Goebel specifically incorporated the cautionary statements contained in General Growth's most recent SEC filings by stating, "Please consult documents General Growth Properties, Inc. has filed with the SEC, specifically the most recent Forms 10-K and 10-Q for a detailed discussion of these risks and uncertainties."

Next General Growth's May 8, 2008 Form 10-Q warned that "there can be no assurance that we can obtain such refinancing or additional capital on satisfactory terms." And later the August 8, 2008 Form 10-Q similarly warned that "[c]ontinued

economic weakness, including in the retail, credit and housing

markets, could further effect [sic] the Company's expected

operating results and access to capital" and added:

> In the event that we are unable to refinance our debt
> on a timely basis and on acceptable terms, we will be
> required to take further steps to acquire the funds
> necessary to satisfy our short term cash needs,
> including additional asset or equity sales, further
> deferring or curtailing of planned expenditures, or
> considering less attractive sources of capital for
> refinancing.

Most of the statements identified in the Complaint as false

and misleading expressly incorporated at least one of those

cautionary statements by reference.  And even where some

statement did not do so expressly, those cautionary statements

were publicly available at the time the statement was made.

Although Plaintiffs contend unpersuasively that General Growth's

cautionary statements were mere boilerplate that failed to give

rise to the safe harbor protection, those statements (1) were

really substantive rather than pro forma and (2) identified the

principal contingencies that thereafter led to the sharp decline

in General Growth's stock price.

While prescience is not required under the PSLRA's safe

harbor provision, General Growth's cautionary statements were in

fact entirely anticipatory of Plaintiffs' claims.  General Growth

identified the exact risks that have been identified in

Plaintiffs' Complaint--those posed by General Growth's potential

inability to refinance its maturing debt.  To call those

statements "boilerplate" borders on the farcical.  So to the extent that this opinion hereafter finds that the statements alleged to be false and misleading were forward-looking, those statements were--with a single exception discussed later--accompanied by meaningful precautionary language that suffices to invoke the safe harbor provisions of the PSLRA barring liability.

Plaintiffs also complain that General Growth's cautionary statements did not change over time to reflect the specific problems it was having obtaining financing.  To determine whether cautionary language is "meaningful," Asher, 377 F.3d at 734-35-- the only case Plaintiffs cite for that argument--has indeed said that it may be relevant in certain cases for courts to investigate whether the cautionary language changed over time. But Asher does not establish a bright-line rule that would eliminate safe harbor protection for a company that clearly discloses the important risk factors but does not later update its investors in real time about its various successes and failures in seeking refinancing for its debt.[7]  Indeed Asher, id.

---

[7]  In Asher Baxter Laboratories had made certain financial projections that failed to materialize.  Baxter had accompanied its projections with cautionary statements, but plaintiffs there argued that those statements were not meaningful because they failed to cover six particular matters that plaintiffs viewed as important risks that led Baxter's actual financial results to be less rosy than projected.  Asher noted that Baxter's cautionary statements and its projections remained unchanged despite new circumstances:  the closing of two plants and a "sterility

makes clear:

> The statute calls for issuers to reveal the "important
> factors" [that could cause actual results to differ
> materially from those in the forward-looking statement]
> but not to attach probabilities to each potential bad
> outcome, or to reveal in detail what could go wrong; as
> we have said, that level of detail might hurt investors
> (by helping rivals) even as it improved the accuracy of
> stock prices.

That limitation, however, has its own limits.  As the later

discussion reflects, the so-called "Metz Declaration" has

confirmed that by September 15, 2008 the real estate financing

well had really run dry in terms of the type and scope of

refinancing that was essential to General Growth's viability.  At

that point, then, it could be found that what had earlier

qualified as meaningful cautionary statements were no longer

truly meaningful (see Tellabs I, 437 F.3d at 599-600, citing

Asher),[8] and that would effectively eliminate the Section

5(c)(1)(A)(i) shelter for post-September-15 knowingly false

forward-looking statements.

---

failure" in the manufacturing of a major product.  Because
Baxter's projections remained unchanged in spite of those
changes, the court could not say whether Baxter "omitted
important variables from the cautionary language and so made
projections more certain than its internal estimates at the time
warranted" (377 F.3d at 734).  Neither could the court say,
however, that Baxter couldn't establish after discovery that the
cautions did reveal the major risks.  Accordingly threshold
dismissal under the safe harbor rubric was not appropriate.

[8]  Because Tellabs II and III addressed the separate concept
of scienter, Tellabs I remains good law in terms of the principle
stated in the text, undisturbed by the later developments in that
case.

Because the cautionary statements did identify the important risk factors--those indicating that General Growth may not have been able to refinance its debt--all of its forward-looking statements except those referred to in the preceding paragraph were accompanied by meaningful cautionary language and are thus protected by the PSLRA's safe harbor.  So the next step in the analysis is to evaluate whether the allegedly false or misleading statements were or were not forward-looking--and thus were or were not protected.

2.  Which Statements Are Sheltered by the Safe Harbor?

Under the PSLRA a forward-looking statement is defined to include (Section 5(i)(1)(A) to (C)):

> (A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;
>
> (B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;
>
> (C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission.

And Section 5(i)(1)(D) expands the "forward-looking" concept to include "a statement of the assumptions underlying or relating to" any of the other just-defined statements.

18

Unfortunately Defendants impermissibly distort that
expansion by focusing solely on the words "underlying or related
to" and ignoring the obvious distinction between an "assumption"
of fact and a statement of an existing fact.  Thus their Mem. 12
n.2, which assertedly explains the Section 5(i)(1)(D) provision,
lists as an example of an "underlying assumption" this Freibaum
statement (see Complaint ¶45(b)):

> We had offers from groups of life companies.

It would frankly be difficult to fashion a statement that is less
of an "assumption" and more a pronouncement of a verifiable (or
refutable) existing fact--indeed, Defendants' position flouts
their own accompanying textual statement and citation (Mem. 12-
13):

> Present-tense statements are forward-looking "as long
> as the truth or falsity of the statement cannot be
> discerned until some point in time after the statement
> is made."  In re LeapFrog Enters., Inc. Sec. Litig.,
> 527 F.Supp.2d 1033, 1046 (N.D. Cal. 2007)(internal
> citations omitted).

This opinion will of course strive to be more faithful to the
statute than Defendants' attempted rewriting of its terms.

Several principles bear mention in giving content to the
statutory definition.  For one thing, verb tense is not
conclusive in deciding whether a statement is forward-looking
(see Tellabs III, 513 F.3d at 705).  In that regard, statements
may include present-tense verbs while still being forward-looking
(id.).  Some statements include a mixture of present and future

19

statements, and the portions that relate to current conditions
are not entitled to the safe harbor protection that may be
afforded to the forward-looking portions (id.).  As <u>Tellabs III</u>,
<u>id</u>. instructed:  "a mixed present/future statement is not
entitled to the safe harbor with respect to the part of the
statement that refers to the present."

     <u>Tellabs III</u> went on to explain that a statement that sales
were "still going strong" indicated both that current sales were
strong and that they would continue to be so (<u>id</u>.).  In that
mixed present-future statement the "element of prediction in
saying that sales are 'still going strong' does not entitle
Tellabs to a safe harbor with regard to the statement's
representation concerning current sales" (<u>id</u>.).  So a defendant
is not entitled to safe harbor protection for an entire statement
just because portions of it are forward-looking.  Instead the
Court must parse each statement to determine which portions merit
potential protection as forward-looking statements and which do
not.[9]

     Some district courts outside of the Seventh Circuit have

---

     [9]  Defendants seek to enlarge the statutory safe harbor by
pointing to the more forgiving view of mixed statements expounded
in <u>Harris</u>, 182 F.3d at 806--a view that would blur (or perhaps
eliminate entirely) the line separating assertions of historical
or existing facts from truly forward-looking expressions.  Even
apart from this Court's duty to follow Seventh Circuit law as
exemplified by <u>Tellabs III</u>, it finds the <u>Harris</u> approach, with
its prospect of shielding substantial instances of securities
fraud, singularly unconvincing.

found that certain statements about a company's ability to refinance maturing debt are forward-looking (see, e.g., <u>GIA-GMI, LLC v. Michener</u>, No. C 06-7949 SBA, 2007 WL 2070280, at *10 (N.D. Cal. July 16); <u>Pew v. Cardarelli</u>, No. 5:03-CV-742 (NAM), 2005 WL 3817472, at *13 (N.D. N.Y. Mar. 17)).  As Plaintiffs rightfully point out, those cases have no precedential force here--in any event, they can hardly be said to have established a per se rule that all such statements are forward-looking and are therefore protected by the statutory safe harbor.

That said, however, statements about General Growth's ability to refinance its debt certainly could have been forward-looking.  Instead of applying a per se rule, this opinion will consider each statement in turn.  And in light of the already-established existence of meaningful cautionary statements during the Class Period, an affirmative answer to the forward-looking question will almost always confirm the absence of liability for that statement without the need to repeat that conclusion each time.

<u>Complaint ¶45</u>

Complaint ¶45 makes allegations regarding an April 30, 2008 Conference Call.  During that call Bucksbaum, Michaels and Freibaum purportedly made numerous misleading statements of fact about General Growth's ability to obtain financing.  Paragraph 45 is divided into numerous subparts, and they are addressed here in

turn.

<u>Complaint ¶45(a)</u>

Complaint ¶45(a) alleges that Freibaum said:

> [W]e've asked all the life companies that we deal with
> whether or not they're going to be out of money or we
> shouldn't ask them if they're interested in making loans on
> our properties, and not a single one has discouraged us from
> doing that.  Some of the loans we're paying off are to life
> insurance--from life insurance companies, and a lot of them
> want to maintain or grow their exposure to General Growth.
> So, you should speak directly with them to find out.  I
> can't speak for them, but when we do inquire, we haven't had
> a single lender to us say, "No, we're through, we're tapped
> out, don't send us anymore mortgage packages."

That statement is not forward-looking.  Freibaum discussed then-

current information about the conversations General Growth

assertedly had with potential lenders concerning debt

refinancing.  That discussion did not qualify as a forward-

looking statement "whose truth can only be discerned after it was

made" (<u>Stavros</u>, 266 F. Supp. 2d at 843 n.7).  Instead whether or

not such discussions had taken place was a fact that was

verifiable at the time of Freibaum's statement.

Although the statement quoted in Complaint ¶45(a) is not

forward-looking, Defendants argue in the alternative that its

statement of present fact has not been established as false when

made.  On that score Complaint ¶45(a) alleges that Freibaum's

statement was directly contradicted by information later provided

22

in the course of this "Metz Declaration":[10]

> {T]he problem is that virtually every source of
> commercial real estate financing has dried up, leaving
> a vastly inadequate supply of credit to meet the demand
> created by current and upcoming maturities [General
> Growth]'s problems are the result of a series of
> unprecedented circumstances in real estate finance
> markets.  Beginning in 2007, the U.S. capital markets
> deteriorated significantly due to rising subprime
> residential mortgage defaults and the deterioration in
> value of certain complex residential mortgage-backed
> securities.  The failures of Fannie Mae and Freddie Mac
> last summer, followed by the government rescue of AIG,
> and finally the bankruptcy of Lehman Brothers on
> September 15, 2008, brought the commercial real estate
> finance markets to a virtual shutdown.

<p style="text-align:center">*          *          *</p>

> For many years, [General Growth] relied heavily on the
> [commercial mortgage back securities ("CMBS")] market
> to provide a steady stream of funds for financing and
> refinancing commercial mortgages.  In 2008, however,
> the CMBS market collapsed.  Investors stopped buying
> CMBS bonds, even ones backed by performing mortgages on
> stable, income-producing properties like [General
> Growth]'s.  When investors lost confidence in these
> securities, underwriters stopped issuing them and
> lenders stopped financing commercial real estate,
> ending what for many years had been a robust source of
> lending to the commercial real estate industry.

<p style="text-align:center">*          *          *</p>

> Since mid-2008, [General Growth] undertook extensive
> efforts to modify or refinance its debt, focus on its
> core business, and restructure the company's finances
> outside of chapter 11.  We tried aggressively to raise
> funds from numerous sources and retained leading

---

[10]  On April 15, 2009 General Growth's then CEO Adam Metz
("Metz") made the statement next quoted in the text during the
course of General Growth's bankruptcy proceeding.  Plaintiffs
contend that the Metz Declaration shows that General Growth had
no realistic financing options at the time the allegedly false
statements at issue were made.

investment banks to undertake a global search for
sources of capital at the corporate level.  Our efforts
to raise both debt and equity capital have been
unsuccessful.  We also made a concerted and sustained
effort to refinance our mortgage debt in 2008,
contacting dozens of major banks, life insurance
companies, and pension funds, but none were willing to
refinance the loans.  Indeed, most made no lending
proposal at all. [General Growth] also reached out to
national and regional lending brokers, but invariably
learned that borrowers seeking more than $20 million--
an amount far less than necessary to refinance most of
[General Growth]'s properties--had not been successful
in locating financing.

From that narrative Plaintiffs glean that no life insurance

companies, banks or pension funds were willing from mid-2008

onward to refinance General Growth's loans and "most made no

lending proposal at all."  But Defendants contend that Plaintiffs

misread the Metz Declaration and attach dates to events that run

counter to the Metz Declaration's account.  Because this Court

must "draw all reasonable inferences in favor of the plaintiff"

on a motion to dismiss (Tellabs III, 513 F.3d at 705), the

dispute about exactly what dates Metz intended to attach to which

relevant events is one that will be left for another time.  For

now it is enough to say that it is reasonable to infer that the

Metz Declaration is consistent with Plaintiffs' position and that

by sometime in mid-2008 Defendants knew that General Growth's

refinancing efforts were doomed, or at least looked decidedly

bleak.  Accordingly the allegations in Complaint ¶45(a) survive

Defendants' current motion, as will other alleged misstatements

that do not qualify as forward-looking (or assumptions that

24

underlie such statements) and are thus not protectable by the statutory safe harbor for forward-looking statements.

Complaint ¶45(b)

Complaint ¶45(b) alleges that Freibaum, in a passage too lengthy to reproduce in full, said that he had "little concern about the ability to refinance" the mortgages on "two of our very best assets...at the end of this year when they come due." Those quoted phrases are examples of forward-looking statements and assumptions underlying forward-looking statements. Such predictions in Complaint ¶45(b) about the ability to refinance are forward-looking, while statements explaining that the two mortgaged properties were among General Growth's best assets constitute underlying assumptions that explained the basis for the forward-looking statement as to General Growth's refinancing prospects on those properties (see W. Pa. Elec. Employees Pension Trust v. Plexus Corp., No. 07C0582, 2009 WL 604276, at *8 n.6 (E.D. Wis. Mar. 6)).

Complaint ¶45(c

Complaint ¶45(c)'s allegations are principally forward-looking. There Freibaum described his expectations as to mortgage financing for the second quarter of 2008. Freibaum's statement that certain potential loans "could possibly aggregate $1.5 billion or even more" was clearly forward-looking. As for the statement "we're in discussions now on additional loans," set

in the present, it constituted a verifiable fact rather than an assumption underlying Freibaum's expectation that certain loans could materialize in the future.  Accordingly it is not within the safe harbor if it was knowingly false--and that remains for future determination.

Complaint ¶45(d)

Complaint ¶45(d) alleges that Freibaum misrepresented that the commercial mortgage backed securities ("CMBS") market was irrelevant to General Growth's ability to obtain financing, something at odds with the Metz Declaration's indication that the collapse of the CMBS market was a major cause of General Growth's bankruptcy.  Freibaum said that the pressure in the CMBS market "doesn't impact anything we're doing currently.  If we need to adjust our capital structure, our amount of debt, our types of debt because of the high quality assets and stable cash flow we have, we'll be able to do that."  Those predictions about General Growth's ability to adjust to the changes in the market were plainly forward-looking.

Complaint ¶45(e)

Complaint ¶45(e) alleges that it was known at General Growth that borrowers seeking more than $20 million were unable to locate financing, yet Freibaum asserted that groups of life insurance companies had been willing to lend General Growth as much as $650 million.  That assertion was not forward-looking.

26

It is not entirely clear from the Metz Declaration when General Growth purportedly knew that loans over $20 million were unavailable.  It is likewise unclear when, if ever, groups of insurance companies had made offers to General Growth for the loans described by Freibaum.  But at this stage in the litigation, with reasonable inferences drawn in Plaintiffs' favor, the contention survives and the resolution of those questions is open to discovery.

Complaint ¶45(f)

Complaint ¶45(f) alleges that despite General Growth's unsuccessful efforts to raise debt and equity capital, Freibaum asserted that General Growth was in pursuit of potentially billions of dollars in capital.  He said that General Growth had "lots of people speaking to lots of institutions" about such efforts and that "you'll see us take advantage of some of these different types of capital throughout the rest of the year and into next year."  While the latter statement was a forward-looking prediction, the representation that General Growth was in conversations with "lots of institutions" was not.  But Plaintiffs do not contend that General Growth had given up all of its attempts to engage in conversations with potential lenders to raise such capital.  In that light the statements in Complaint ¶45(f) that actually have any bearing on Plaintiffs' claims are not actionable.

Complaint ¶45(g)

Complaint ¶45(g) alleges that Freibaum said General Growth expected to be able to get mortgages over the long-term. Such expectations were of course forward-looking. Freibaum explained that the tone of conversations between General Growth and other parties about different ways to raise capital had "improved," providing a basis for his expectations that mortgages would be forthcoming. Although that statement of opinion might perhaps be viewed as unprotected, it was so subjective and amorphous that it can fairly be characterized as nonactionable as well.

Complaint ¶47

Complaint ¶47 alleges that General Growth's May 8, 2008 Form 10-Q, signed by Freibaum and containing signed certifications by Freibaum and Bucksbaum, stated that General Growth "currently anticipate[s] that we will be able to repay or refinance all of our debt on a timely basis." That statement, framed in the then present, was a verifiable fact and is therefore unprotected under the PSLRA.

Complaint ¶48

Complaint ¶48 alleges that in a June 5, 2008 Form 8-K signed by Freibaum, General Growth made the misleading statement that it was working on two financial deals to meet upcoming debt maturities that could reach into the billions of dollars. While statements made about the anticipated deals themselves were

forward-looking, the fact that General Growth was said to have been engaging in conversations with potential deal partners was not.  But Plaintiffs have not alleged that such conversations were not taking place.  In fact, the portion of Complaint ¶48 that Plaintiffs decided to put in boldface type concerns only the potential dollar values of the deals, not the fact that conversations about potential deals were in the works.  As such, the only portions of Complaint ¶48 that are relevant to Plaintiffs' claims were forward-looking.

Complaint ¶50

Complaint ¶50 alleges that in a July 11, 2008 Form 8-K signed by Freibaum, General Growth reported that it had closed on the first stage of a $1.75 billion mortgage loan facility and had received $875 million in loan proceeds.  Attached to the Form 8-K was a press release that said the funds were used to repay all but one of General Growth's loans (a $73 million loan with a prepayment penalty) that were set to mature in the third quarter of 2008.  While those statements were not forward-looking, Plaintiffs never explain in their Complaint or their submissions on the present motion what if anything was false about those representations.  To the contrary, Defendants contend that Complaint ¶50 demonstrates that General Growth was able to secure financing--and significant amounts of it--during the Class Period.  That being so, the Form 8-K statements are not a

29

predicate for liability--indeed, it seems possible that they may ultimately cause serious damage to Plaintiffs' case.

Complaint ¶53

Complaint ¶53 makes numerous allegations related to a July 31, 2008 Conference Call. It is divided into several subparts, each of which is analyzed separately below.

Complaint ¶53(a)

Complaint ¶53(a) alleges that Bucksbaum misrepresented General Growth's ability to refinance its debt when he said, "we have multiple plans and options available to us to take care of our remaining 2008 and 2009 maturities." Although Defendants unconvincingly argue that to be a forward-looking statement, a more plausible reading of the statement is that it is a representation of an asserted fact: that General Growth knew (or at least actually believed) that it had options available to it at the time the statement was made. Plaintiffs may be able to show that the statement was a misrepresentation.

Complaint ¶53(b)

Complaint ¶53(b) recounts numerous paragraphs of statements by Freibaum that are alleged to constitute misleading statements about General Growth's ability to refinance its debt. Each of the statements highlighted by the Plaintiffs was indeed a forward-looking statement or a related underlying assumption, except for Freibaum's often-used phrasing such as "we currently

expect" or "we currently anticipate" during the call.  In that regard, what has earlier been said about Complaint ¶47 applies here as well.

Complaint ¶53(c)

Complaint ¶53(c) alleges that Freibaum made material misrepresentations when he said:

> The most important fact of all is that we don't have any balloon debt maturities that will present an insurmountable challenge to refinance given the myriad sources of obtainable cash that we have outlined today.

That statement followed Freibaum's lengthy examination of what "possibilities" General Growth could have "reasonably expected" in terms of obtaining cash.  And the quoted language itself (which is the only language in Complaint ¶53(c) that Plaintiffs have highlighted in bold type) looked toward the future in terms of what "will" or will not be "obtainable."  Such statements were forward-looking.

Complaint ¶53(d)

Complaint ¶53(d) alleges that Freibaum represented that General Growth had access to cash that would be sufficient to convince lenders to provide financing despite the weakened CMBS markets.  Complaint ¶53(d) cites Freibaum's statement that there was no need for General Growth to consider reducing its dividend payment because, as he had previously explained, General Growth had many different means by which it could obtain cash.

Some of the statements in Complaint ¶53(d) were forward-

looking.  They spoke to sources where General Growth might have obtained cash in the future.  But other statements ("Our balance sheet is not broken" and "[W]e have no losses to cover") were not forward-looking.  They described what were purported to be then-existing facts.  Neither were those statements assumptions underlying the forward-looking statements.  Rather than explaining why Freibaum thought General Growth had future access to cash, they described why General Growth didn't need it.  Those statements survive the motion.

Complaint ¶53(e)

Complaint ¶53(e) alleges that Freibaum said the collapse of the CMBS market had no impact on General Growth's ability to refinance its debt.  Most of the statements in that paragraph were forward-looking statements about General Growth's future plans for securing financing from fixed income investors and how those plans would have differed from plans involving CMBS investors.  There were no representations that such financing was already achieved.  Freibaum's representation that long-term fixed income investors told General Growth that they were "very happy" to buy bonds--in the future--secured by mortgages represented, if not a forward-looking statement in itself, at least an underlying assumption for why Freibaum would have thought such financing was available to General Growth.

<u>Complaint ¶53(f)</u>

Complaint ¶53(f) alleges that Freibaum and Bucksbaum misrepresented the purported availability of equity capital and stated that General Growth did not in fact want that capital at that time.  Much of the language quoted in that paragraph was forward-looking in that it discussed future "objectives," expectations and plans as to the availability of joint venture partners in the future.  Even the statement "there's a tremendous amount of equity that is <u>waiting</u> to be invested" is predictive in nature.

But other statements, rather than being forward-looking, were statements of "observed fact" that would not qualify for safe harbor protection (Harris, 182 F.3d at 806).  Examples of such facts capable of verification (or its absence) are Freibaum's statement that there was "still considerable interest in co-ownership with General Growth of high quality malls, a very significant interest" and his representation that others were interested in co-ownership with General Growth.

<u>Complaint ¶56</u>

Complaint ¶56's allegations involve the August 8, 2008 Form 10-Q signed by Freibaum and containing signed certifications by Freibaum and Bucksbaum.  Statements there described the types of refinancing transactions General Growth was then "currently considering," its anticipations regarding its ability to repay or

refinance its debt on a timely basis and its belief that adequate
sources of funds were on hand to meet short term needs.  Except
for the "currently considering" representation and the statement
about its <u>belief</u> (rather than a PSLRA protected assumption, as to
which the analysis of Complaint ¶47 applies), the Form 10-Q
statements were forward-looking.

<u>Complaint ¶57</u>

    Complaint ¶57 deals with a September 17, 2008 Press Release.
Plaintiffs contend that the paragraph makes allegations about
General Growth's ability to obtain financing "in general."  But
in fact the cited language amounted to nothing more than a
forward-looking statement about General Growth's projection for
funding its loan facility in light of changes it made to its
repayment guaranty.

<u>Complaint ¶62</u>

    Complaint ¶62 alleges that Bucksbaum, in a September 18,
2008 Interview, misrepresented General Growth's ability to obtain
financing when he said he had "every confidence" that General
Growth would refinance its pending debt and that General Growth
would "continue to pursue all the various financing alternatives
that are available to us."  To begin with, this Court rejects
Defendants' effort to discount Bucksbaum's statements as
nonactionable "puffery."  By definition, the concept of harmless
puffery describes statements that the market recognizes as

34

nonmaterial--but here the Bucksbaum statement quickly reversed
the downward trend in the General Growth stock price, with a
sharp uptick following directly after issuance of the statement.

Even more to the point, that Bucksbaum statement came hard
on the heels of the September 15, 2008 bankruptcy of Lehman
Brothers, which the earlier-quoted Metz Declaration characterized
as having "brought the commercial real estate finance markets to
a virtual shutdown."  That dramatic turn of events, if credited
(as must be done on the current motion), could reasonably be
found to have converted what had earlier been "meaningful
precautionary language" into something no longer "meaningful" in
real-world terms.  In turn Bucksbaum's statements of current
fact--his "every confidence" that refinancing would be
accomplished and his reference to "the various financing
alternatives that are available to us"--could prove to have been
misleading falsehoods.  Hence Complaint ¶62 survives dismissal.

What has been said here as to Bucksbaum's stated belief
echoes the Supreme Court's opinion in <u>Va. Bankshares, Inc. v.
Sandberg</u>, 501 U.S. 1083 (1991), which also dealt with whether
"statements of reasons, opinion, or belief" (<u>id</u>. at 1090) may be
actionable under the securities laws.  On that score the Court
stated (<u>id</u>.):

> That such statements may be materially significant
> raises no serious question.

That being so, the Court answered the question of actionability

in the affirmative where they "are reasonably understood to rest
on a factual basis that justifies them as accurate, the absence
of which renders them misleading" (id. at 1093).  That aptly
describes the Bucksbaum statement that forms the gravamen of
Complaint ¶62.

Complaint ¶75

    Complaint ¶75's allegations concern a September 22, 2008
Press Release in which General Growth states that it:

> currently anticipates that it will be in a position to offer
> long-term fixed-rate portfolio financing to lenders in mid
> to late November, and in the interim will actively pursue
> several sources of financing for the Company's near term
> maturing obligations.

That too is at odds with the Metz Declaration.  So even though it
was in part forward-looking, it too may be viewed as
unaccompanied by meaningful cautionary statements, and Plaintiffs
may continue to advance their claims based on that statement
through the stage of factual development.

Other Count I Issues

    Complaint ¶44

    Complaint ¶44 alleges that in an April 29, 2008 Press
Release Bucksbaum was quoted as saying, "our malls remain a very
attractive venue for our customers to shop, for our retailers to
do business, and for our lenders to lend."  Defendants do not
challenge that statement as forward-looking--their contention is
rather that it is nonactionable because it came before the

beginning of the Class Period (see, e.g., <u>In re IBM Corp. Sec.</u>
<u>Litig.</u>, 163 F.3d 102, 107 (2d Cir. 1998)).  Plaintiffs argue that
the press release is actionable despite its date because it was
issued after the close of the markets on April 29 and could thus
have operated to inflate the stock price only beginning on
April 30, the first day of the Class Period.  But Plaintiffs
chose to define the Class Period as they did, and they cite no
authority for their position that this Court should reach back by
even a single day.  It is not for this Court to amend the
Complaint-defined Class Period or blur its boundaries.

<u>     Complaint ¶52</u>

    Complaint ¶52 concerns allegations as to a July 30, 2008
Press Release in which General Growth announced its decision to
increase its quarterly dividend by 11% in the third quarter of
2008.  On that same day a Form 8-K signed by Freibaum was filed
that attached the press release.  Plaintiffs state that financial
analysts interpreted the increased dividend as a positive
"statement" regarding General Growth's ability to obtain
financing--but Defendants point out that the press release did
not in fact include any discussion of General Growth's dividend.
Plaintiffs have not provided any sort of response to that
argument--rightfully so, because the press release did not
mention General Growth's dividend at all.  Complaint ¶52 is not
actionable.

__Complaint ¶104__

Defendants move to dismiss the allegations against Bayer, Hoyt, Schlemmer, Gern, Polonia, Downs, Stewart and Berman ("Form 144 Defendants") by arguing that the Complaint alleges no facts regarding their claimed participation in any alleged securities fraud.  Complaint ¶104, however, alleges (1) that each Defendant's stock sales, including those of the Form 144 Defendants, were accompanied by a Form 144 filed with the SEC, entitled "Notice of Proposed Sale of Securities Pursuant to Rule 144" and (2) that the filer of each Form 144 expressly represented that he or she:

> [d]oes not know any material adverse information in regards to the current and prospective operations of the issuer of the securities to be sold which has not been publicly disclosed.

Plaintiffs allege that the quoted language (the "Attestation") was false or misleading in that it failed to acknowledge General Growth's inability to refinance.

Defendants contend that the allegations against the Form 144 Defendants should be dismissed because (1) they make no reference to any particular Defendant, (2) they fail to allege that any of the Form 144 Defendants knew the Attestations were false when made, (3) they do not allege what was false about the Attestations and (4) they provide no dates as to when the Attestations were filed or any information as to whether any such documents were actually filed by any Defendant during the Class

Period.  Defendants further argue that the Attestations are
nonactionable because they are relatively inaccessible documents
that contain nothing more than immaterial boilerplate and as such
did not positively influence the market.

Contrary to Defendants' arguments, Plaintiffs do allege
(1) why the Attestations were false (Complaint ¶¶104 and 112-13),
(2) that each Form 144 Defendant knew the Attestations were false
when made (Complaint ¶¶23, 113, 114(a), 114(b) and 116), (3) that
the Attestations were filed in advance of each of the Form 144
Defendants' stock sales (Complaint ¶104) and (4) the specific
dates of those sales (Complaint ¶114(a)(vi)).  Plaintiffs further
allege that each of the Form 144 Defendants was a senior officer
at General Growth who participated directly in the failed efforts
to secure the necessary financing at issue.

As for Defendants' argument that the Attestations are
immaterial boilerplate having no influence on the market, the SEC
specifically requires insiders who sell stock to file Forms 144.
Although the Attestations may be relatively obscure statements,
they are included in public documents, and the presumption is
that "all public information is reflected in the [stock] price"
(Asher, 377 F.3d at 732 (emphasis in original)).  And as to
whether the Attestations may be said to be couched in boilerplate
language, that purported boilerplate contains a flat-out
representation that the filer had no material insider knowledge

39

"in regards to the current and prospective operations of the issuer of the securities to be sold which has not been publicly disclosed"--and the Form 144 has a boldface warning just below the signature line that any intentional misstatements are federal crimes under 18 U.S.C. §1001. Plaintiffs have alleged that the Attestations were false, and that surely suffices for the survival of the claims against the Form 144 Defendants.

General Growth's Ethics Policy

In addition to asserting that Defendants made material misstatements about General Growth's ability to refinance its debt, Plaintiffs allege that Bucksbaum, Freibaum and Michaels (collectively the "Ethics Defendants") participated in and concealed loans that violated General Growth's Code of Business Conduct and Ethics ("Code") and that Plaintiffs suffered damages as a result. Defendants' motion attacks that charge on a number of fronts.

General Growth's Code prohibited officers and directors from making loans to, or guaranteeing the loans of, other officers or directors because such loans could create conflicts of interest. Violators of the Code could face discipline, including immediate discharge. Notwithstanding the Code's loan-making prohibition and its potential for penalties, Bucksbaum is alleged to have entered into secret undisclosed agreements to provide personal loans to Freibaum and Michaels to enable repayment of their

40

margin calls.  Those loans, purportedly made to enable Freibaum
and Michaels to avoid or at least forestall the forced
liquidation of their stock, are alleged to have exceeded $100
million.  On October 27, 2008 General Growth issued a press
release that revealed the loans and admitted that the Ethics
Defendants had violated the Code.

According to Plaintiffs, the Ethics Defendants made false
and misleading statements about their violation of the Code
during the Class Period.  First, Plaintiffs contend that
publication of the Code on General Growth's website constituted a
statement that the Ethics Defendants (and others for that matter)
were complying with the Code.  Second, Plaintiffs argue that
Bucksbaum and Freibaum made false and misleading statements when
they certified General Growth's quarterly Forms 10-Q ("Form 10-Q
Certifications"), which attested that they had disclosed:

> [a]ny fraud, whether or not material, that involves
> management or other employees who have a significant
> role in the registrant's internal control over
> financial reporting.

Finally, Plaintiffs assert that Freibaum and Michaels represented
that certain stock sales were "sold to repay [a] loan" on Forms 4
filed with the SEC, but they failed to disclose that the making
of that loan violated the Code.

At the outset the Ethics Defendants launch a global attack
on those charges, relying on Plaintiffs' failure to plead loss
causation resulting from the nondisclosure of the personal loans.

They point out that on the day after the loans were revealed to the market General Growth's stock price spiked upward during intraday trading before settling at 20 cents below the previous day's close.  General Growth's stock price had fallen over $40 during the months preceding the revelation of the loans, and the Ethics Defendants urge that the slip in price after the revelation should be understood to be part of the stock's general decline rather than anything attributable to the Ethics Defendants.  Defendants further note that the stock price recovered during the following week.  So, say the Ethics Defendants, whatever decline occurred in the stock price was de minimis at best, rendering the claims against them nonactionable.

After the loans were revealed to the market, General Growth's stock price fell from $2.17 to $1.97--a decline of some 20%.  Such a drop, taken in the context of the stock's general decline over time, may not prove at a later stage of this litigation to be attributable to the Ethics Defendants.  But on the present motion to dismiss, with all reasonable inferences drawn in Plaintiffs' favor, the loss causation pleading requirement has been met.[11]

Next Defendants contend that the allegations about the loans

----

[11]  This holding makes it unnecessary to venture into the parties' other arguments concerning loss causation.  If those arguments become relevant at a later stage of the litigation, they can be addressed at that time.

42

should be dismissed because the statements that were purportedly
misleading were not statements at all or were otherwise not
actionable.  That contention involves several aspects that
require examination.  And the first of those calls for a careful
look at the SEC's Form 10-Q Certification forms.

Those forms contained these signed certifications by
Bucksbaum and Freibaum pursuant to the Sarbanes-Oxley Act of
2002:

> The registrant's other certifying officer and I have
> disclosed, based on our most recent evaluation of
> internal control over financial reporting, to the
> registrant's auditors and the audit committee of
> registrant's board of directors (or persons performing
> the equivalent functions):
>
> *          *          *
>
> (b) Any fraud, whether or not material, that involves
> management or other employees who have a significant
> role in the registrant's internal control over
> financial reporting.

Plaintiffs allege that the Form 10-Q Certifications were
misleading because Bucksbaum and Freibaum knew that the Ethics
Defendants (themselves included) violated the Code, but they did
not disclose the breach to General Growth's auditors, board of
directors or investors.

Defendants counter that none of the Ethics Defendants
"spoke" on the subject of the personal loans through the Form 10-
Q Certifications because the forms speak only to issues relating
to "internal control over financial reporting."  They cite to SEC

43

documents that purportedly limit the "any fraud" language so that it would not cover the Code violations at issue (see, e.g., SEC Office of the Chief Accountant and Division of Corporate Finance, Management's Report on Internal Control Over Financial Reporting and Disclosure in Exchange Act Periodic Reports Frequently Asked Questions (June 22, 2004), <u>available at</u> http://www.sec.gov/info/accountants/controlfaq0604.htm; Management's Report on Internal Control over Financial Reporting and Certification of Disclosure in Exchange Act Periodic Reports, Securities Act Release No. 8238, Exchange Act Release No. 47,986, Investment Company Act Release No. 26,068, 68 Fed. Reg. 36,636, 36,640 (June 18, 2003)).

Plaintiffs argue that the SEC does not immunize certifying officers from liability for violating their supposed duty to report "all frauds" of which they are personally aware. Plaintiffs cite to no case law that supports their expansive reading of the language in the Form 10-Q Certifications.  In fact, Plaintiffs' reference to Securities Act Release No. 8238, also cited by Defendants, seems to cut the other way:  It contemplates limiting the term "internal control over financial reporting" to compliance with "laws and regulations directly related to the preparation of financial statements."  Undeterred, Plaintiffs declare in conclusory fashion that because the Ethics Defendants knew about their own Code violations, the Form 10-Q

Certifications were necessarily false.

While this Court does not of course condone the disregard of any fraud, the weight of authority credits Defendants' arguments as to the Form 10-Q Certifications.  Nondisclosure of the personal loans did not "directly relate to" the preparation of financial statements.  They were therefore not addressed in the Form 10-Q Certifications.  As such, the Form 10-Q Certifications provide no support for Plaintiffs' allegations regarding the Code.

Plaintiffs further contend that publication of the Code on General Growth's website--and its "continuous publication" every day it remained posted there--constituted a representation that the Ethics Defendants were not violating that Code.  Again Plaintiffs can cite no case that has held that publication of an ethics code on a website is equivalent to a representation that the code is not being violated.  For their part, Defendants respond that a company's adoption and publication of a code of ethics does not imply that all of its directors and officers are in compliance with that code (see <u>Andropolis v. Red Robin Gourmet Burgers, Inc.</u>, 505 F. Supp. 2d 662, 685-86 (D. Colo. 2007)).  Defendants have the better of that argument, and this Court does not buy Plaintiffs' position based on the mere publication of the

Code on General Growth's website.[12]

As a claimed final string to their bow for a possible shot at the Ethics Defendants, Plaintiffs contend that Freibaum and Michaels filed several Form 4 Statements of Changes in Beneficial Ownership with the SEC that were materially false or misleading.[13]  Plaintiffs allege that Freibaum and Michaels represented that their stock sales were to repay a "loan" or to fund a "margin call" and that those representations were false or misleading because each failed to disclose the secret loans that violated the Code.

That position is really a nonstarter.  It is an impermissible stretch to move from a reference to a loan repayment in a report of a stock sale to a requirement that the reporting person must also state whether the loan had stemmed from the breach of an ethics code.  And with the failure of that argument as well, Plaintiffs have come up empty on their entire effort to rely on asserted Ethics Code violations.

<u>Scienter Pleading</u>

Last--but far from least--among the Count I issues is the special PSLRA pleading requirement that demands a cogent and

---

[12]  That in turn obviates any need to consider whether the continuous publication of the Code on the website brought the Code, originally posted before the beginning of the Class Period, into the Class Period.

[13]  Bucksbaum is not targeted in that claim.

46

compelling inference of scienter.  Section 4(b)(2) requires that any allegation that a defendant made a false or misleading statement must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" (see also <u>Tellabs II</u>, 551 U.S. 308, 314 (2007)).  And that required state of mind is of course the familiar "scienter, a mental state embracing intent to deceive, manipulate, or defraud" (<u>id</u>. at 319 (internal quotation marks omitted)).  <u>Tellabs II</u>, <u>id</u>. at 323 further instructs that "in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences."

Thus a complaint will survive a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged" (<u>id</u>. at 324).  But an inference favoring Plaintiffs' claims "need not be irrefutable, <u>i.e.</u>, of the smoking-gun genre, or even the most plausible of competing inferences" (<u>id</u>. (internal quotation marks omitted)).  For forward-looking statements, the required scienter is "actual knowledge" (<u>Tellabs III</u>, 513 F.3d at 704-05)).  For present-tense statements, the scienter required is actual knowledge or a reckless disregard of a substantial risk that the statement is false (<u>id</u>.).

47

Here Defendants assert that Plaintiffs have failed to plead scienter adequately because (1) they rely on impermissible "group pleading" of scienter, (2) Defendants often sold their shares of General Growth stock to avoid or satisfy margin calls and (3) their trades were not calculated to maximize their personal benefit in that they were not made at the market peak.  Those contentions will be dealt with seriatim.

First Defendants invoke the proscription on "group pleading" as taught by our Court of Appeals in such cases as Pugh v. Tribune Co., 521 F.3d 686, 693 (7th Cir. 2008):

> We have rejected the "group pleading doctrine," a judicial presumption that statements in group-published documents are attributable to officers who have daily involvement in company operations; thus, the plaintiffs must create a strong inference of scienter with respect to each individual defendant.

This Court cannot, consistently with Pugh, presume that the documents identified in the Complaint are attributable to each of the individual defendants simply by virtue of their positions at General Growth.

But while Pugh forbids such use of the group pleading presumption, it does not render each individual defendant's position within a company irrelevant.  Individual positions of authority within a company may still have relevance to the scienter inquiry if that inquiry focuses on whether the plaintiffs have succeeded in creating "a strong inference of scienter with respect to each individual defendant" (Pugh, id.).

48

While a court cannot "presume" scienter, a strong inference of scienter may still be credited where "it is almost inconceivable" that an individual defendant would be unaware of the matters at issue (see <u>Silverman</u>, 2008 WL 4360648, at *14).

Although Defendants question the continuing relevance of this Court's opinion in <u>Dardick v. Zimmerman</u>, 149 F. Supp. 2d 986 (N.D. Ill. 2001) in light of <u>Pugh</u> and other cases that have proscribed the group pleading presumption, this Court disagrees. <u>Dardick</u> did not at all depend on any presumption that group-published documents were attributable to officers by virtue of their positions within the company.  To the contrary, <u>Dardick</u>, <u>id</u>. at 988-89 held that where a company was experiencing "a deep and pervasive corporate illness," it certainly followed that every officer or director of the company knew of the "extraordinarily serious financial difficulties" faced by the company or if not, that a failure to have that knowledge would equate to reckless disregard.

<u>Pugh</u> does not alter that analysis.  In <u>Dardick</u> as here the company's very survival was at stake, and so in this case (just as in <u>Dardick</u>) the insider Defendants either had to know about General Growth's ability or inability to refinance its looming debt or, if they did not, such lack of knowledge would amount to reckless disregard.  Defendants' argument regarding group pleading is without merit.

49

Defendants also claim inadequacy in the pleading of scienter because there is a stronger inference that Defendants sold their stock, not to take advantage of inflated prices that resulted from their alleged misrepresentations, but rather to satisfy margin calls over which they had no control. In that respect Plaintiffs admit that some of Defendants' stock was sold to satisfy margin calls. But what Defendants fail to acknowledge is that Plaintiffs more broadly allege that Defendants, by various fraudulent means, attempted to inflate the stock price in an attempt to <u>avoid</u> margin calls. That they were unable at times to stave off such sales, given the precipitous decline in the stock's price over time, has nothing to do with the scienter inquiry. It is not important whether Defendants ultimately succeeded or failed to profit from the alleged fraud (see <u>Tellabs III</u>, 513 F.3d at 710). That argument "confuses expected with realized benefits" (<u>id</u>.).

Finally, this Court does not credit Defendants' other argument that challenges the sufficiency of Plaintiffs' scienter showing on the ground that Defendants' stock trades were not calculated to maximize their personal benefit. Defendants misconstrue the Complaint's allegations when they protest that they did not time their elective sales of stock precisely when prices were at their highest during the Class Period. On that score, once again Plaintiffs have alleged an altogether different

50

set of facts:  that Defendants made misrepresentations so that they could <u>avoid</u> massive margin calls in the first instance. That Defendants were unable to do so says nothing as to the question of scienter.

Moreover, Defendants also ignore the material benefits that Plaintiffs allege were behind the allegedly unethical loans entered into by the Ethics Defendants.  Finally, once the stock had sunk to unforeseen depths, Plaintiffs allege that Defendants inflated the price of the stock artificially and then made sales timed specifically to maximize their benefit as best they could at that time, even if that benefit was nothing near what would have been reaped had those sales taken place at the time of the Class Period highs.  Defendants' lack of foresight does nothing to negate the sufficiency of the pleadings.

<u>Count II</u>

At long last this opinion can turn from Count I considerations to the other two claims advanced by Plaintiffs. First, Count II contains allegations that Defendants "rigged the system" by "obtaining a 'short-selling' ban from the SEC" and then, suddenly and without warning, by selling millions of shares of stock at inflated prices.  Apparently not content to rest on that ground, Plaintiffs attempt through their responsive briefs to advance allegations and theories beyond what Count II itself asserted.

51

Thus Plaintiffs seek to persuade this Court that Count II's allegations encompass Bucksbaum's September 18, 2008 interview and Defendants' Rule 144 Attestations. Neither of those efforts succeeds.

While Count II does mention Bucksbaum's September 18 statement, at most that statement provides a background explanation for the motives behind Count II's core allegations. Such a by-the-way mention of the Bucksbaum statement in Count II does not support its elevation to a substantive component of the Count II claim.

As for the Attestations, they are not mentioned in Count II at all. Plaintiffs claim that Count II, by realleging the 125 preceding paragraphs, includes the Attestation, but that carries no persuasiveness. To incorporate 125 paragraphs into Count II by a one-paragraph reference, and then to expect Defendants and this Court to pluck out precisely which of those is now asserted to be crucial to understanding Count II's allegations, flouts the requirement to provide "fair notice" of the claim asserted (<u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007)). This Court knows it is not omniscient, and it suspects that defense counsel are not either. Nor do the Rules require the use of paranormal talents to reconstruct a comprehensible claim on Plaintiffs' behalf.

In short, Count II will be read as it was written. It will

be treated as advancing only allegations as to a purported scheme on Defendants' part to include General Growth on the SEC's short-sell ban list and then to benefit from that inclusion through the sale of inflated stock.

On that score Defendants stress that Count II is bereft of any explanation as to how any of the Defendants participated in any effort to have General Growth stock added to the short-sell ban list. Plaintiffs make no attempt to provide any such explanation--indeed, Plaintiffs argue that the question whether any particular Defendant was involved in getting General Growth included on the short-sell ban list is irrelevant.

Not so. To state a claim under Rule 10b-5(a) and (c), Plaintiffs must allege that each defendant (1) committed a deceptive or manipulative act (2) with scienter (3) that affected the market for securities, and further that Defendants' acts caused Plaintiffs' injuries (see Last Atlantis Capital LLC v. Chicago Bd. Options Exch., Inc., 455 F. Supp. 2d 788, 793 (N.D. Ill. 2006)). Without an explanation as to who played what role in the alleged scheme, beyond an assertion of stock sales after the short-list ban went into effect,[14] Count II fails to meet the pleading requirements. It is dismissed.

---

[14] Moreover, as Defendants point out, none of Downs, Berman, Polonia and Stewart traded any General Growth stock after the company was added to the short-sell ban list.

<u>Count III</u>

Lastly, Complaint Count III seeks to impose control person liability on all Defendants under Exchange Act Section 20(a). Defendants move to dismiss that count because Plaintiffs have assertedly failed (1) to allege an underlying violation of securities law, (2) to plead with particularity that each individual defendant exercised control over the general operations of General Growth and (3) to plead with particularity that each defendant possessed the power or ability to control the alleged misstatements.

To state a Section 20(a) claim, "a plaintiff must first adequately plead a primary violation of securities law" (<u>Pugh</u>, 521 F.3d at 693). In that respect Count III incorporated the violations alleged in Counts I and II, thus satisfying the requirement.

That being the case, a total dismissal of Counts I and II would have compelled the dismissal of Count III as well due to the absence of the necessary underpinning in securities law (see <u>In re Allscripts, Inc. Sec. Litig</u>, No. 00 C 6796, 2001 WL 743411, at *12 (N.D. Ill. June 29)). But because this opinion has provided some basis for Plaintiffs to proceed under Count I (though not Count II), Plaintiffs will be given the benefit of the doubt, but only in terms of the threshold sufficiency of Count III.

That said, however, Plaintiffs' reliance on the incorporated claims of Count I to establish control person liability under Count III still faces problems as to some vital aspects of the pleading requirements.  This opinion turns to those deficiencies, which ultimately doom Plaintiffs' Count III claims.

In that regard <u>Harrison v. Dean Witter Reynolds, Inc.</u>, 974 F.2d 873, 881 (7th Cir. 1992) has held that to plead control person liability properly, a plaintiff must allege that "the alleged control-person actually participated in, that is, exercised control over, the operations of the [controlled] person in general" (see also <u>Schlifke v. Seafirst Corp.</u>, 866 F.2d 935, 949 (7th Cir. 1989)).  This Court had occasion to interpret the general control requirements articulated in the <u>Schlifke</u> decision in <u>Davis v. Coopers & Lybrand</u>, 787 F. Supp. 787, 801 (N.D. Ill. 1992).  There the plaintiffs alleged only that defendants were principals, officers or directors of the corporate entity at issue.  This Court ruled that "[a]lthough plaintiffs have specified which positions the individual defendants held in the various corporate entities, they have alleged no other facts to support an inference of 'control'" (<u>id</u>.).

Here Complaint ¶134 has alleged:

Because of their position of control and authority as senior officers, directors and/or controlling shareholders of General Growth, the Defendants were able to, and did, control the contents of the various reports, press releases, public statements and public filings that General Growth disseminated in the

marketplace during the Class Period.  Throughout the
Class Period, the Defendants exercised their power and
authority to cause General Growth to engage in the
wrongful acts complained herein.  Therefore, the
Defendants were "controlling persons" of General Growth
within the meaning of Section 20(a) of the Exchange
Act.  In this capacity, they participated in the
unlawful conduct alleged that artificially inflated the
market price of General Growth common stock.

Next Complaint ¶135 merely states that Defendants, as controlling

persons, are liable under the Exchange Act.[15]

        None of that is sufficient to state a claim.  As <u>Starr v.</u>

<u>!Hey, Inc.</u>, No. 01 C 6087, 2003 WL 21212596, at *4 (N.D. Ill.

2003) has said (citing numerous cases):

        Courts within this District have consistently held that
        a plaintiff may not premise control person liability
        solely upon status within the company.

In <u>Starr</u>, <u>id</u>. as here, the count alleging control person

liability was essentially a single substantive paragraph in which

the plaintiffs said that by virtue of defendants' status as

managers, directors or shareholders, they had and exercised the

power to "engage in the unlawful acts and conduct complained of

herein."

_____

        [15]  In their response to the current motion, Plaintiffs
continue to rely merely on positions of authority to maintain
Count III allegations against Bayer, Gern, Hoyt, Polonia,
Schlemmer, Berman, Downs and Stewart.  As for Bucksbaum, Freibaum
and Michaels, Plaintiffs assert--but only in their response, not
in the Complaint itself--that those three individuals were the
only General Growth employees who were quoted in press releases
or who spoke, during investor conference calls, to the question
whether General Growth had the ability to obtain the necessary
financing.

Starr held, as this Court does now, that where a plaintiff "self-servingly pleads a bare legal conclusion that the...defendants were control persons," without alleging facts other than defendants' status to support their conclusion, a count for control person liability is improperly pleaded and must be dismissed.  And it is worth adding, without having to explore the full scope of today's greater pleading demands under the much-mooted Twombly-Iqbal dichotomy, that conclusion is certainly fortified by the teaching of those decisions.

### Conclusion

As set out in this memorandum opinion and order, Defendants' motion to dismiss is denied in part and granted in part as to Count I and is granted in its entirety as to Counts II and III. This action is set for an early status hearing at 9:30 a.m. September 24, 2009 to discuss (1) the timing of an answer to the surviving portion of the Complaint as well as (2) the establishment of procedures for moving forward with the litigation.

_____
Milton I. Shadur
Senior United States District Judge

Date:  September 17, 2009